# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| Tillerman Seeds, LLC (n/k/a Legacy Seed Companies, LLC), Legacy Seeds, LLC, and D.F. Seeds, LLC<br><br>Plaintiff,<br><br>v.<br><br>Tillerman & Co., LLC, Remos Lenio, and Philip Blanchard<br><br>Defendants. | Civil Action No. 19-cv-00529<br><br>JURY TRIAL REQUESTED |

## <u>COMPLAINT</u>

Tillerman Seeds, LLC (now known as Legacy Seed Companies, LLC) (hereinafter referred to as either "Tillerman Seeds" or the "Company"), Legacy Seeds, LLC, and D.F. Seeds, LLC for their Complaint against Defendants Tillerman & Co., LLC[1] (hereinafter referred to "T&C"), Remos Lenio ("Lenio"), and Philip Blanchard ("Blanchard") state:

### NATURE OF THE ACTION

1.      The Company conducted two acquisitions, which it financed through a combination of private securities offerings and lending facilities, for which it unwittingly engaged an unregistered securities broker, which also acted as its chief financial officer and strategist for negotiating the acquisitions and conducting the private offerings. Unfortunately, the unregistered broker, T&C through its principals Lenio and Blanchard,

---

[1]     Despite common name, there is no organizational or corporate affiliation between Plaintiff Tillerman Seeds, LLC and Tillerman & Co., LLC.

also misrepresented and failed to disclose material financial information to investors and bankers in connection with one of those acquisitions.  Defendants conduct has also caused significant damages to the Company.  This lawsuit is intended to seek voiding of the unlawful engagement agreement Defendants misled Plaintiffs into entering for the provision of broker services, rescission of amounts for broker services paid thereunder as well as compensation for those damages.

2.     Since its formation, Tillerman Seeds' growth plan was to operate acquired companies as standalone entities with shared back-office services and collaboration on customer service, research and development, marketing, and sales.

3.     In or about November 30, 2016, Tillerman Seeds engaged T&C and its principals, Lenio and Blanchard (T&C, Lenio, and Blanchard are collectively, the "Brokers"), to provide investment banking services, preparation of offering materials to solicit debt and equity financing for the acquisitions, identification of and solicitation of lenders and equity investors, management services such as having T&C act as its chief financial officer, among other activities to oversee its acquisitions and capital raising activities (the "Brokerage Services"). The engagement of the Brokers was documented in a November 30, 2016 engagement letter (the "T&C Engagement Agreement") (**Exhibit 1**). As compensation, Tillerman Seeds agreed to pay T&C a monthly retainer, a success fee based on the transaction value for each transaction, as well as a percentage of shares tied to the economic value of the Company based on the transactions.

4.     On or about September 30, 2017, Tillerman Seeds, through T&C, purchased substantially all the assets of D.F. Seeds, Inc.  (the "DFS Acquisition").  Immediately

2

thereafter, Tillerman Seeds also issued Class A shares in a private offering pursuant to Regulation D of the Securities Act of 1933 conducted by T&C for which T&C was responsible for and did file the Form D on behalf of Tillerman Seeds, as well as preparation, distribution and collection of the offering documents in addition to finding and soliciting investors.

5.      On or about July 3, 2018, Tillerman Seeds conducted a second private offering of Class A shares in anticipation of the acquisition of Legacy Seeds, Inc. ("LSI"). This second offering was also conducted by T&C in the same manner as before pursuant to Regulation D and for which T&C directed the preparation of the offering materials, solicited investors and completed the offering between July 3 and mid-August 2018.

6.      On July 30, 2018, Tillerman Seeds, (through its wholly owned subsidiary Legacy Seeds, LLC) purchased substantially all the assets of Legacy Seeds, Inc. ("the LSI Acquisition"; together with the DFS Acquisition, the "Acquisition") pursuant to an Asset Purchase Agreement (the "LSI APA").

7.      Legacy Seeds, LLC and D.F. Seeds, LLC are now wholly owned subsidiaries of Tillerman Seeds, LLC.

8.      In performing the Brokerage Services for purposes of both Acquisitions, the Brokers engaged in multistate offerings to raise capital to fund the Acquisitions through the issuance of Class A shares of Tillerman Seeds.  On information and belief, for both Acquisitions, the Brokers engaged on behalf of Tillerman Seeds their frequent outside counsel through which the Brokers oversaw and directed the preparation of private placement memoranda ("PPM") and subscription agreements for each offering.  On

3

information and belief, Lenio personally oversaw the preparation of the PPM by outside counsel and in his capacity as principal of T&C which served as CFO for Tillerman Seeds, he prepared certain financial statements for use in connection with the offerings.

9.      Further thereto, in connection with the Acquisitions, Lenio undertook negotiations for and on behalf of Tillerman Seeds.  Specifically, with respect to the LSI Acquisition, Lenio negotiated the overall purchase price including such details as the post-closing "net working capital adjustment," which was a target amount of working capital for the ongoing operations of the business that would be finalized once Tillerman Seeds' accounting was updated post-acquisition.

10.     The net working capital adjustment was a material financial term of the acquisition of LSI, as to which the amount and timing of payment would need to be disclosed to prospective investors in Class A shares for the LSI Acquisition once that figure could be calculated with more precision.

11.     Prior to and continuing throughout the Class A offering, Lenio worked with the sellers of LSI to determine the exact amount and payment conditions related to the net working capital adjustment.

12.     As a result, during the second Class A Share Offering in July 2018, Lenio knew that the net working capital adjustment was estimated to be approximately $5.7 million and would result in a significant liability owed to LSI by Legacy Seeds, LLC post-closing.

13.     Yet T&C, Lenio and Blanchard misrepresented and/or omitted to disclose to prospective Class A investors during the offering and after the LSI Acquisition the timing,

4

extent and significance of the net working capital adjustment that Tillerman Seeds would have to pay post-acquisition.

14.     The PPM, and on information and belief T&C's communications with investors during the second Class A shares offering, misrepresented and omitted to disclose the extent and nature of the net working capital adjustment, even as Lenio knew that figure would add at least several million dollars or more to the liabilities of Tillerman Seeds, Tillerman Seeds could not presently afford to pay such an amount, and failure to include such amount in the Company's financial projections based on the acquisition would have the effect of artificially inflating the success fees and stock that the Brokers would receive upon closing the Acquisitions by artificially boosting the value of Tillerman Seeds post-acquisition.

15.     In addition, T&C through Lenio, as CFO, failed to apprise Tillerman Seeds existing lenders regarding the magnitude and timing of the net working capital adjustment.

16.     The Brokers, including Lenio and Blanchard individually, operated as unregistered securities brokers for and on behalf of Tillerman Seeds in connection with the Acquisitions.

17.     Tillerman Seeds relied upon the Brokers and Lenio individually, acting through T&C as the Company's CFO, to conduct the offerings properly consistent with the federal securities laws, especially given their purported experience and background.

18.     Nonetheless, the Brokers' actions in conducting the offerings for Tillerman Seeds required them to have registered as a broker with the U.S. Securities & Exchange Commission pursuant to Section 15(a) of the Securities Exchange Act of 1934 (15 U.S.C.

§ 78a) (the "Exchange Act"), which they failed to do thereby violating Section 15(a)(1) (15 U.S.C. § 78o(a)(1)).

19.     Further, the Brokers' and Lenio's misrepresentations and omissions to investors in conducting the offering of Class A shares to consummate the LSI Acquisition, specifically the non-disclosure and misrepresentation of information related to the net working capital adjustment, in connection with that offering was at worst fraudulent and at best negligent and has now caused Tillerman Seeds significant damages in the millions of dollars, including but not limited to having to rescind Class A investors as well as other fees and costs as detailed herein.

20.     Based thereon and for the reasons set forth herein, Plaintiffs are seeking, among other forms of relief, rescission of the T&C Engagement Agreement and all compensation paid to T&C, Lenio and Blanchard pursuant thereto based on Section 29(b) of the Exchange Act (15 U.S.C. § 78cc(b)).

21.     In addition, under Michigan common law, Tillerman Seeds is seeking compensatory and incidental damages directly caused by the Brokers' actions for breach of fiduciary duty, fraud, negligence, and negligent misrepresentation against T&C, Lenio and Blanchard including to recover: (i) the amounts Tillerman Seeds has had to pay and will have to pay to mitigate the damages caused by T&C, Lenio and Blanchard including rescinding investors from the defective Class A offerings, (ii) professional fees related to same, (iii) potential fines and/or civil penalties with regulatory entities, (iv) increased borrowing costs imposed by lenders, and (v) any amounts paid in fees and shares to T&C, Lenio and Blanchard than it otherwise should have for the services they rendered.

6

## THE PARTIES

22.     Plaintiff Tillerman Seeds, LLC is a Delaware limited liability company with its principal place of business in Greenville, Michigan.  Tillerman Seeds is a regional seed company, created to acquire small, regional independent seed companies, especially those with strong non-GMO product lines.

23.     Plaintiff Legacy Seeds, LLC is a Delaware limited liability company with its principal place of business in Scandinavia, Wisconsin. In July 2018, Legacy Seeds, LLC was a wholly-owned subsidiary of Tillerman Seeds, LLC. Legacy Seeds, LLC continues to be wholly-owned by Tillerman Seeds, LLC. Legacy Seeds, LLC was formed for the express and exclusive purpose of acquiring the business of Legacy Seeds, Inc.

24.     Plaintiff D.F. Seeds, LLC is a Delaware Limited Liability Company with its principal place of business in Dansville, Michigan.  D.F. Seeds, LLC is a wholly owned subsidiary of Tillerman Seeds, LLC and was formed for the express and exclusive purpose of acquiring the business of D.F. Seeds, Inc.

25.     On information and belief, Defendant T&C is a Michigan limited liability company with its principal place of business in Grand Rapids, Michigan.  On information and belief, T&C is wholly owned by its principals Lenio and Blanchard.

26.     On information and belief, Lenio is a resident and citizen of the State of Michigan, who lives and works in Grand Rapids.  On information and belief, at all relevant times, Lenio was the Managing Director and principal of T&C.  Lenio, acting on behalf of T&C performed the Brokerage Services for Tillerman Seeds.  Lenio also acted as T&C's appointed agent as chief financial offer of Tillerman Seeds, Legacy Seeds, LLC, and D.F.

7

Seeds, LLC.  Lenio was a board member of Tillerman Seeds at the time it approved of the DFS and LSI Acquisitions.  After the LSI Acquisition, Lenio became a board observer. Lenio holds 50,000 Class A Units and 241,666 Class B Units of Tillerman Seeds.

27.     On information and belief, Blanchard is a resident and citizen of the State of Michigan, who lives and works in the Grand Rapids area. On information and belief, Blanchard is a principal of T&C and acted on behalf of T&C in performing the Brokerage Services to Tillerman Seeds.  Blanchard was a board member of Tillerman Seeds at the time it approved of the LSI Acquisition and the DFS Acquisition. Blanchard holds 50,000 Class A Units and 241,666 Class B Units of Tillerman Seeds.

## JURISDICTION AND VENUE

28.     This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 in so far as the action arises under 15 U.S.C. § 78a, et seq. of the Exchange Act.

29.      This Court also has exclusive jurisdiction pursuant to 15 U.S.C. § 78aa(a) with respect to violations of the Exchange Act and of all suits in equity and actions at law brought to enforce any liability or duty created by the Exchange Act.

30.     Lastly, the Court has supplemental jurisdiction under 28 U.S.C. § 1367 relative to state common law claims.

31.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) as well as 15 U.S.C. § 78aa(a) because at least one Defendant is a resident or inhabitant of this District, transacts business here and a substantial portion of the acts giving rise to the claims took place in this District.

## FACTS

**A.    T&C Is Engaged in Activities As a Securities Broker including pursuant to the Engagement Agreement with Tillerman Seeds.**

    **1.    T&C Held Itself Out to the Public At All Relevant Times as Being Engaged in the Business of Effecting Transactions in Securities For their Clients, Which Constituted Broker Activity**

32.    At all relevant times, T&C, was engaged in the business of effecting transactions in securities for the account of others.

33.    On information and belief, this includes such activities by T&C as:  (a) regular participation in securities transactions, including soliciting investments from individual and institutional investors in exchange for unregistered securities in privately-held companies; (b) acting as a broker in its own capacity rather than as an employee of the issuer; (c) being paid by transaction-based compensation based upon the outcome of securities transactions as opposed to by salary; (d) a history of selling the securities of other issuers; (e) involvement in soliciting potential and existing investors to purchase securities in multiple private offerings; and (f) active recruitment of securities investors.

34.    Individually and collectively, these activities meet the definitional criteria of and requirements for registration of a broker pursuant to Sections 3(a)(4) and 15(a) of the Exchange Act.

35.    For example, on its website (available at https://tillermanco.com/), T&C:

(a)    holds itself out as an investment and merchant banking firm, which provides clients a wide range of services to clients, including Mergers & Acquisition advisory, capital sourcing, merchant banking, transaction communications

including to key stakeholders including employees and investors, and valuations.  According to its website, "[o]ur principals have advised on hundreds of successful transactions."  A copy of T&C's Services page from its website is attached hereto as **Exhibit 2** and is incorporated herein by reference.

(b)     provides an "Executive Summary" of its services, stating the following about its ability to help clients source capital:

> We help clients source capital for growth, recapitalizations and transactions. Over the years, we've built solid relationships with regional banks, private equity funds, family offices, individual investors, VCs, brokers and mezzanine investors that have funded transactions for our clients as well as our own ventures. We will work with you to find the right capital source and negotiate the right terms to fit the needs of your family-owned or closely held business.

(c)     touts the professional qualifications, experience, and investment banking services of its principals.

(d)     With respect to Mr. Lenio, who was Tillerman Seeds' primary contact at T&C, T&C boasts his "30 years of transaction experience" and "substantial experience as a banker, CFO, corporate finance consultant and transaction specialist," that Mr. Lenio also has "advised on more than 100 mergers, acquisitions, divestitures and buyouts of privately held companies as well as valuations, recapitalizations and capital sourcing for companies across the growth continuum," and that Mr. Lenio has a Master's in Business

Administration ("MBA") from the University of Michigan's Ross School of Business, one of the premier graduate business programs in the country.

(e)     T&C also describes Mr. Lenio's "Core Competencies," including "Capital Formation & Financing," "Project Finance," and "Financial Management & Control," and that he is a "capital sourcing specialist." Among the skills T&C claims Mr. Lenio brings to clients based on his over his thirty-year career are: (1) financial modeling, including cash flow forecasting, projection development; (2) capital sourcing, including from institutional investors; (3) business valuation; and (4) fundraising from institutional and individual investors.

(f)     With respect to Mr. Blanchard, T&C touts on its website that he: is a Chartered Financial Analyst; has an MBA from Columbia University; brings more than 30-years' experience to clients, including extensive experience as an investment banker and investment manager; has advised on more than 100 transactions, including mergers, acquisitions, LBOs, MBOs, valuations, turnarounds and restructures; and "He offers Tillerman clients considerable expertise in the areas of deal structure, creative financing, analysis and due diligence."

(g)     With respect to communications, T&C claims that, "[o]nce a transaction is finalize[d], we help clients explain 'what it means' to key stakeholders: employees, customers, suppliers, investors, community leaders, industry leaders and the media."

11

(h)     With respect to valuations, T&C claims that "[o]ur transaction experience makes us a logical choice for helping companies, boards of directors, lenders and others understand how your company would be valued in the current market."

2.     **The T&C Engagement Agreement Provided that T&C, Through Lenio and Blanchard, Would Perform Similar Broker Services for Tillerman Seeds In Connection with the Capital Raising Activities Associated with the Acquisitions**

36.     The November 30, 2016 T&C Engagement Agreement documents Tillerman Seeds' retention of T&C to provide to Tillerman Seeds the Brokerage Services in support of its acquisition strategy, including the DFS and LSI Acquisitions.  *See* **Exhibit 1**.

37.     For example, under the terms of the Engagement Agreement, T&C contracted to:

(a)     assist Plaintiff "in the purchase of assets of Legacy Seeds, Inc. in accordance with the Letter of Intent ('LOI') signed October 14, 2016" (the "Legacy LOI").  Services were to include preparing "the requisite documents and presentations to solicit debt and equity financing for the transaction" and "[i]dentify and solicit potential lenders and investors on the Company's behalf."

(b)     In addition, T&C was to "[a]ct as Chief Financial Officer of the Company and coordinate interactions between the Company, its current and potential banks, and its current investors and potential future investors."

(c)     For the Brokerage Services, T&C would also be compensated by a monthly retainer of $8,500 per month; an economic interest in Tillerman Seeds to be a non-dilutable carried interest equal to 5% of the economic value of Tillerman Seeds; and a success fee of 1.5% of the transaction value of any successful acquisition.

38.     As reflected in the T&C Engagement Agreement, T&C expected to conduct offerings to raise funds sufficient to finance the Acquisitions.

39.     As a part of the engagement, on information and belief, T&C actively recruited investors in multiple states, using mail, telephone and/or the internet, to participate in each of the Class A offerings and invest in Tillerman Seeds.

40.     In sum, T&C's services to Tillerman Seeds constituted acting as a securities broker within the meaning of the Exchange Act.

41.     On information and belief, T&C is not, and at all relevant times was not, a registered broker with the U.S. Securities & Exchange Commission as required by the Exchange Act.

42.     On information and belief, Lenio is not, and at all relevant times was not, registered as a broker in his individual capacity.

43.     On information and belief Lenio is not, and at all relevant times was not, registered as an associated person of a registered broker.

44.     On information and belief, Lenio is not, and at all relevant times was not, licensed to engage in the Brokerage Services he performed for Tillerman Seeds.

US.123761058.02

45.     On information and belief, Blanchard is not, and at all relevant times was not, registered as a broker in his individual capacity.

46.     On information and belief, Blanchard is not, and at all relevant times was not, registered as an associated person of a registered broker.

47.     On information and belief, Blanchard is not, and at all relevant times was not, licensed to engage in the Brokerage Services he performed for Tillerman Seeds, LLC.

**B.     T&C Assists Tillerman Seeds With the Acquisition of DF Seeds, LLC  By Conducting the First Tillerman Seeds Private Offering for which T&C is a acting as a Broker**

48.     After retaining T&C, Tillerman Seeds embarked on its acquisition strategy. The first acquisition was the DFS Acquisition.  T&C, through its principals, Lenio and Blanchard, acted as a broker in raising the capital necessary for Tillerman Seeds to acquire the assets and liabilities of DFS.

49.     Pursuant thereto, on information and belief, T&C retained outside counsel with whom it had done other transactions, to assist Tillerman Seeds in preparation of a PPM and subscription agreement at the direction of Lenio.

50.     On or about September 30, 2017, Tillerman Seeds entered into an acquisition agreement with DFS by which Tillerman Seeds acquired and DFS, became a wholly owned subsidiary of Tillerman Seeds.

51.     In connection with the DFS Acquisition, Tillerman Seeds, at T&C's and Lenio's direction, conducted an offering up to $2.2 million of Class A shares pursuant to which T&C caused to be prepared and issued a PPM dated September 25, 2017 (the "First

14

Class A Shares Offering") for the offering terminating November 1, 2017.  T&C then used the PPM to solicit prospective investors to purchase the Tillerman Seeds Class A shares.

52.     As reflected in the PPM, Tillerman Seeds was conducting an offering pursuant to Regulation D of the Securities Act.

53.     Based thereon, on October 20, 2017, Lenio filed a Form D with the SEC, which is a "Notice of Exempt Offering of Securities."  A copy of that Form D is attached as **Exhibit 3**.

54.     As reflected in the Form D for the First Class A Shares Offering, Lenio executed it as a "manager" on behalf of Tillerman Seeds, T&C was listed as a "promoter" and Lenio and Blanchard were listed as Directors of Tillerman Seeds.

55.     Further, the Form D stated that there was no sales compensation paid to a broker, even though it also listed in the "Use of Proceeds" T&C as receiving a "Transaction fee" of $100,000 in connection with the First Class A Shares offering.

56.     The PPM also listed T&C, Lenio and Blanchard as the contact persons for investors and disclosed that T&C would receive annual payments of $60,000 for "management services" including for "providing merger and acquisition support, company oversight, monthly financial management, lender and investor relations, operations support, company oversight, and strategic input on sales and marketing activities."

57.     Further, pursuant to the T&C Engagement Agreement, Tillerman Seeds issued Class B units (which were non-dilutable, voting shares entitling holders of Class B units to operate as managers of Tillerman Seeds) to T&C's principals Lenio and Blanchard.

US.123761058.02

58.     At the conclusion of the DFS Acquisition and First Class A Shares Offering, therefore, pursuant to the T&C Engagement Agreement, Tillerman Seeds paid T&C, including through its principals Lenio and Blanchard, more than $100,000 in transaction-based compensation based on the share offering, an ongoing management services fee of $60,000, and distributed Class B shares to each of Lenio and Blanchard as the payment to T&C for its Brokerage Services.

**C.     T&C and Lenio Orchestrate Tillerman Seeds' LSI Acquisition, Including the Negotiation of the Post-Closing Net Working Capital Adjustment, Which Given Its Projected Magnitude, Lenio Knew Or Should Have Known Was a Material Term of the Second Class A Share Offering**

59.     As part of the T&C Engagement Agreement, it was contemplated that T&C would pursue an acquisition of LSI.  As early as October 2016, Tillerman Seeds entered into preliminary negotiations with LSI by execution of an initial letter of intent.

60.     Lenio, for and on behalf of Tillerman Seeds, handled negotiations with LSI's then-principal and part-owner Bruce Ceranske ("Ceranske").  Negotations between Lenio and Ceranske continued into 2017, during which discussions Ceranske raised as part of the sales price the "net working capital adjustment."

61.     Ceranske disclosed to the Brokers that the net working capital adjustment would be a significant liability payable at the LSI Acquisition's closing.

62.     Indeed, rather than a "true up" of the parties' good faith projections of working capital, the APA's net working capital adjustment operated like a seller's note to increase the purchase price by millions of dollars and defer that obligation until after the close of 2018.

63.     The Brokers understood that the net working capital adjustment was material to the acquisition of LSI.

64.     In or around April 2017, it became clear that Tillerman Seeds would not have sufficient funds to acquire Legacy Seeds at that time.  As a result, Tillerman Seeds and LSI suspended their discussions regarding a potential acquisition at that time.

65.     Discussions between Tillerman Seeds and LSI resumed in late 2017 or early 2018.

66.     Tillerman Seeds' decision to re-engage in negotiations with LSI was based in large part on the Brokers notifying Tillerman Seeds that they were confident they could raise sufficient funds to acquire LSI through a second offering of Class A shares and additional lending facilities.

67.     In an email from Ceranske to Lenio dated April 20, 2018, Ceranske again raised the net working capital adjustment issue and provided Lenio with a projected working capital calculation of $9,749,000 as of April 18, 2018 to avoid any surprises as to the magnitude of the net working capital adjustment that could be required at closing and to ensure that Tillerman Seeds would have sufficient funds to pay him and his partners what he believed would be a multi-million dollar obligation.

68.     In response, on April 23, 2018, Lenio emailed Ceranske regarding historical working capital needs at LSI, observing that it fluctuated throughout 2017, from a low of $1.8 million in January 2017, to a high of nearly $15 million in May 2017 and then back down to nearly $2 million in December 2017.

US.123761058.02

69.     Thus, Lenio explained, "if we calculate 'excess net working capital' as of the time of closing we will not have an accurate number and we could harm [Tillerman Seeds] if too much is paid out or not pay you and [Ceranske's partner] enough if the payment is underestimated."

70.     Lenio concluded that the net working capital adjustment (also referred to as the "excess working capital") should be calculated at the time of closing based on "the previous-year's end working capital but that the payment on the actual amount, with reconciliation to the estimated number, at the end of the year or when all of the above have been paid and we can see what the actual number is at that time."

71.     As contemplated by Lenio at this time, the net working capital adjustment would not be paid until *after closing and after the end of the year*.  This was a departure from previous negotiations whereby the net working capital would have been part of the consideration paid for the purchase at close.

72.     Thereafter, between June 26 and June 28, on information and belief, Lenio coordinated analysis of the potential net working capital adjustment with outside counsel and Tillerman Seeds then-CEO (James Sheppard) ("Sheppard"), developed and circulated a worksheet that would track the various items that would be needed to calculate the net working capital as of June 30, 2018.

73.     As Sheppard explained in a June 28, 2018 email to Ceranske and copying others including Lenio, apparently based on discussions with Lenio, Tillerman Seeds would "true up against the accrued values as actual numbers come in.  The [net working capital] will represent the profit or loss generated against sales and expenses for your first

18

6-months (through 6/30/2018).  Most likely, *it will be a sizable profit for you*, Steve and Tyler to split after reconciliation." (Emphasis added).

74.     Thus, as of June 2018, and before the Second Class A Shares Offering began on or about July 3, 2018, the Brokers knew, understood and directed that the net working capital adjustment related to the acquisition of LSI: (i) would be based on LSI's sales and expenses through June 30, 2018; (ii) could not and would not be calculated or paid at the time of closing on the LSI Acquisition; (iii) would likely be paid "at the end of the year"; (iv) would be based on LSI's historical actual working capital for 2017, which they knew fluctuated significantly and would be in the millions of dollars; (iv) would likely represent a significant profit for LSI's principals; and, therefore, (v) Tillerman Seeds could not presently afford to pay it.

75.     Thereafter, between July 12 and July 30, 2018, the closing date of the LSI Acquisition, Tillerman Seeds and LSI finalized details for the LSI Acquisition including the Asset Purchase Agreement related to same, which also required resolution of the terms of the net working capital adjustment.

76.     Towards this end, on July 12, 2018, Ceranske emailed Lenio a preliminary "ballpark" net working capital calculation of $2.8 million and expressed his concern about Tillerman Seeds' ability to pay this debt and his preference that the debt be secured in some fashion.

77.     On that same day, Lenio responded stating that even as to the "ballpark" $2.8 million figure, the Company "cannot make a payment of this magnitude until we know more certainty what the payment amount will be" but promising to make "partial

payments" as they work through the process.  By this, Lenio acknowledged that even a

$2.8 million net working capital payment involved a payment of significant magnitude to

Tillerman Seeds' liabilities.

78.     The following day, on June 13, 2018, Cerankse sent Lenio calculations

reflecting LSI's $2.8 million projections for the net working capital payment.

79.     On July 24, 2018, Ceranske and LSI updated their analysis of the projected

net working capital adjustment calculations, reflecting $5,779,139.06 to be paid by

Tillerman Seeds' subsidiary Legacy Seeds, LLC by some time in early 2019.

80.     On July 30, 2018, the LSI Acquisition was completed upon execution of the

LSI APA.

81.     Under the terms of the LSI APA, the purchase price was based upon an

"initial" and a "final" cash payment.  The initial cash payments required Legacy Seeds,

LLC to pay approximately at least $15.5 million less certain debts and credits.  The Final

Cash payment was a post-closing condition of the APA and would be calculated based on

Net Working Capital of the new Legacy Seeds, LLC as of December 31, 2018, five months

after the closing date.  Thus, the Net Working Capital adjustment would become payable

to LSI sometime in early 2019 and would also carry an 8% interest rate per annum until

paid by Legacy Seeds, LLC.

82.     Also, attached to the LSI APA was an exhibit setting forth the net working

capital adjustment projection of $5,779,139.06, the same as the previous July 24, 2018

calculation.

83.     Thus, the net working capital adjustment represented a significant financial commitment and term of the acquisition to which Legacy Seeds, LLC (and through it Tillerman Seeds) was committed.

**D.     The Brokers Conduct the Second Class A Shares Offering by Misrepresenting and Omitting Material Terms Regarding the LSI Acquisition, Legacy Seeds, LLC's and Tillerman Seeds Financials and Liabilities Related to the Net Working Capital Adjustment**

84.     Almost a month before the LSI Acquisition closed, on July 3, 2018, T&C, Lenio and Blanchard formally began the Second Class A Shares offering for Tillerman Seeds shares, the proceeds of which were to be used in connection with the LSI Acquisition.

85.     According to the terms of the PPM prepared by T&C with outside counsel, the offering targeted a raise of $6.6 million at an offering price per Class A unit of $1.00, and stated that the Company would not use any subscription funds unless it had binding subscriptions for at least $6,000,000 in Class A units by August 31, 2018.

86.     Thus, unless T&C, Lenio and Blanchard could solicit and sell investors to buy at least $6,000,000 shares in less than 60 days, the offering (and potentially the impending LSI Acqustion) would fail.

87.     As with the First-Class A Shares Offering, the PPM listed T&C, Lenio and Blanchard as contact persons.  The PPM also explained that T&C would receive a $307,500 administrative fee in addition to $100,000 annual payments for "management services."

88.     The PPM disclosed that funding raised by this Offering would be used to acquire LSI, as to which Tillerman Seeds had signed a non-binding letter of intent dated

June 29, 2018 ("LOI") to acquire LSI for $18 million and to provide additional working capital for the Company, attached as Exhibit A to the PPM.

89. The PPM also directed investors to read the disclosures in the PPM regarding the anticipated transactions terms as reflected in the LOI, that the final transaction terms could differ materially from the LOI and that "investors will not be entitled to revoke their capital commitments based upon the final transaction terms" so that subscriptions were "irrevocable," unless the Company did not meet the $6,000,000 offering minimum.

90. Thus, at the time the offering began on July 3, 2018, the PPM prepared by and through the Brokers directed prospective investors to the LOI to understand the material deal terms, specifically regarding the purchase price.

91. The LOI disclosed that the purchase price payment due at close was approximately $18 million and that "at closing" Seller will agree to deliver to Purchaser a mutually agreed upon amount of Net Working Capital, determined in accordance with a blank schedule listing various categories of assets and liabilities. (A copy of the LOI is attached at **Exhibit 4**).

92. Exhibit A to the LOI provided a blank schedule listing various categories of assets and liabilities to be calculated and netting to develop a "Net Working Capital" figure as of June 30, 2018, presumably once known. As reflected therein, the Net Working Capital analysis was not completed or even projected as of the date of the LOI, June 30, 2018.

93. Nowhere in the PPM prepared by the Brokers, however, did it describe a range or amount regarding what the Net Working Capital payment could be. Nor did the

22

PPM prepared by the Brokers explain the risks that the Net Working Capital payment could be a substantial liability of Tillerman Seeds and/or Legacy Seeds, LLC upon closing and post-closing of the acquisition, much less the wide fluctuations in LSI's historical net working capital needs.

94. Further, the LOI appeared to minimize the nature and extent of the Net Working Capital Adjustment as simply a "customary post-close true up."

95. Additionally, the language of the LOI referred to the Net Working Capital adjustment as an amount that Seller (LSI) would deliver to Purchaser (Tillerman Seeds) at Closing.

96. Rather, as T&C and Lenio knew, as of June 2018 before the PPM was issued on July 3, 2018, the net working capital adjustment would: (i) not be calculated or paid at the time of closing on the LSI Acquisition; (ii) likely be paid "at the end of the year"; (iii) be based on LSI's historical actual working capital for 2017 through June 30, 2018, which had fluctuated greatly and could be in the millions of dollars based thereon; (iv) likely represent a significant profit for *and payment to* (not from) LSI (and its principals); and (v) represent a significant liability (not an asset) of Tillerman Seeds and/or Legacy Seeds, LLC (the Purchaser), which neither could at that time afford to pay.

97. Nowhere else in the PPM or any attachment thereto as prepared by T&C and Lenio did it describe the magnitude of the net working capital adjustment that Tillerman Seeds and/or Legacy Seeds would owe LSI and its principals.

98. With respect to T&C, the PPM further disclosed that it would be paid a $307,500 "administrative fee" by the Company upon the closings of the acquisition of DFS

US.123761058.02

and LSI and that T&C would also act as CFO for an additional management fee of $100,000 for providing "merger and acquisition support, company oversight, monthly financial management, lender and investor relations, operations support, and strategic input on sales and marketing activities."

99.     On information and belief, T&C, through Lenio, structured these "administrative" and "management fees" pursuant to the T&C Engagement Agreement, and which constitute transaction-based compensation related to the sale of the Class A shares.

100.    The Brokers conducted the Second Class A Share Offering beginning on or about July 3, 2018 through August 21, 2018, when the last prospective investor subscribed, by which time Tillerman Seeds had exceeded its $6 million minimum offering threshold.

101.    On information and belief, at no time during the Second Class A Shares Offering between July and August 2018, did the Brokers disclose to any of the Class A Share investors any of the facts surrounding the Net Working Capital adjustment anticipated to be paid by Tillerman Seeds and/or Legacy Seeds, LLC to LSI or its principals in early 2019.

102.    On information and belief, the Brokers failed to make these disclosures even though they knew as of July 24, 2018 that the Net Working Capital Adjustment was projected by LSI to be at least $5.77 million, while the Brokers were conducting the Offering for Tillerman Seeds and soliciting investors,.

103.    In addition to the $407,500 "administrative" and "management fees" paid to T&C in connection with the Second Class A Share Offering, upon completion of the LSI

24

Acquisition closing and the Second Class A Share Offering, Tillerman Seeds also issued Class B shares pursuant to the T&C Engagement Agreement to Lenio and Blanchard, so that they now had approximately totaling 241,666 Class B shares each based on the "success" of the share offering and LSI acquisition.

**E.  The Form D Executed and Filed by Lenio for Tillerman Seeds for the Second Class A Offering on July 18, 2018 Misrepresented and Omitted Information Regarding T&C's Role as a Securities Broker as Well as the Fact that T&C was Receiving More than $407,000 in Transaction Based Compensation in connection with the Offering**

104.    In addition, as reflected in the PPM, Tillerman Seeds was conducting an offering pursuant to Regulation D of the Securities Act.

105.    Based thereon, on July 18, 2018, Lenio filed a Form D with the SEC, which is a "Notice of Exempt Offering of Securities."  A copy of that Form D is attached at **Exhibit 5**.

106.    As reflected in that Form D, which Lenio executed as a "manager" on behalf of Tillerman Seeds, approximately $2,445,000 in Class A shares had been sold, with another $4,155,000 remaining to be sold.

107.    Again, no broker was listed on the Form D as being used or compensated, although unlike the previous Form D Lenio filed in October 2017, it omitted to disclose the existence and payment to T&C.

108.    Whereas the PPM explained that T&C was receiving $407,500 in "management and administrative service" fees, the Form D misrepresented and/or omitted to disclose T&C's involvement or that T&C was receiving "management and administrative fees," and only disclosed that Tillerman Seeds was using proceeds from the

offering for making such a payment without reference to whom the payment would be made.

109.    In executing the Form D, therefore, it appears Lenio also misrepresented or omitted to disclose T&C's role not only as Tillerman Seeds broker, but also that it was being paid proceeds from the Second Class A Shares Offering of at least $407,500.

**F.    Tillerman Seeds Reasonably Relied Upon T&C as well as Lenio and Blanchard Individually to Conduct the Offerings and Acquisitions Properly**

110.    Based on T&C's and its principals' represented expertise having conducted more than 100 acquisitions and related financings, Tillerman Seeds selected the Brokers with the understanding and expectation that the Brokers would know how to and would perform their duties in compliance with all legal and professional standards applicable to brokers and financial officers.

111.    This was especially true because both Lenio and Blanchard: (1) were appointed to the board of managers of Tillerman Seeds to assist the Company with its acquisition strategy; and (2) would receive non-dilutable interests in Tillerman Seeds as well as a commission.

112.    Regulatory compliance was more crucial in this case considering the various roles played and duties owed by the Brokers.

113.    Tillerman Seeds reasonably relied on the Brokers to perform their multiple duties in conformance with all applicable laws, regulations, and standards.

114.    Tillerman Seeds also expected and understood that the Brokers were knowledgeable about all applicable laws and regulations associated with their duties as

US.123761058.02

they related to the transaction with the LSI Acquisition, the DFS Acquisition, and performance of the duties of Tillerman Seeds' Chief Financial Officer.

115.    Moreover, Tillerman Seeds understood from the Brokers that they had any and all necessary registrations, licenses, certifications, and other qualifications to perform the duties for which they were hired.

**G.    Tillerman Seeds Learns From Investors About the Broker's Misconduct In the Second Class A Share Offering and Takes Step to Mitigate that Harm**

116.    After the Second Class A Share Offering closed in August 2018, Tillerman Seeds learned from investors that were solicited by the Brokers and received the PPM, that the Brokers had not advised them about the magnitude and true nature of the net working capital adjustment.

117.    After the LSI Acquisition closed, Tillerman Seeds learned that the Brokers had not conveyed during the Second Class A Shares Offering, particularly after the LSI Offering, that many of these investors had no idea that the net working capital adjustment calculations would require more than a $5,000,000 payment to LSI.

118.    Tillerman Seeds has since taken steps to mitigate the harm caused by the Brokers in misrepresenting and failing to make necessary disclosures, including offering dissatisfied investors the opportunity to rescind their investment and receive their investment funds with interest.  Tillerman Seeds' efforts to mitigate the harm are ongoing.

119.    Tillerman Seeds terminated its relationship with the Brokers in February 2019.

120.    Despite that termination, Lenio continues to solicit investments in Tillerman Seeds without any authority or direction to do so.  As recently as June 14, 2019, Lenio has approached investors in Tillerman Seeds to acquire their shares on behalf of a "group [that] is fully financed and should be able to complete a transaction within 60 days."

121.    The Brokers stood to profit from soliciting investments and made sure that there was no barrier to closing the LSI Acquisition.

122.    Having already failed to consummate an acquisition during the first round of negotiations with LSI, the Brokers had increased incentive to consummate the LSI Acquisition to ensure their personal gain.

123.    Had the Brokers disclosed the networking capital adjustment or their lack of SEC registration, the LSI Acquisition would not have occurred on the terms agreed to by Tillerman Seeds' investors.

124.    As a result of the Brokers' failure to disclose material financial terms to investors and Lenio's continuing conduct in soliciting transactions, Tillerman Seeds has suffered and continues to suffer significant damages.

**H.    The Brokers Also Misled Tillerman Seeds' Lenders Based on Inaccurate Projections They Prepared, Which Did Not Incorporate the Net Working Capital Obligation**

125.    On information and belief, the Brokers also created projections that did not factor in the net working capital obligation.

126.    These projections were showed to at least one of Tillerman Seeds' lenders, Horizon Bank, on July 24, 2018.  Based on this failure, Legacy Seeds, LLC and Tillerman Seeds were significantly undercapitalized based on the Brokers' "analysis."

US.123761058.02

127.   In the first quarter of 2019, Legacy Seeds, LLC and Tillerman Seeds were required to obtain significant and expensive financing.  Such financing would not have been necessary had the Brokers properly disclosed the obligation and performed an appropriate analysis of projected cash flow and the future liability.  In fact, the Brokers' faulty analysis caused $4 million of financing to become unavailable, which caused the need for emergency, expensive financing in early 2019.

**COUNT I:**
**VOIDING OF T&C ENGAGEMENT AGREEMENT**
**PURSUANT TO 15 U.S.C. § 29(b) AND 15 U.S.C. § 78o(a)(1) FOR**
**FAILURE TO REGISTER AS A BROKER AND DEALER AS REQUIRED BY THE**
**EXCHANGE ACT (AGAINST T&C)**

128.   Plaintiffs restate and reallege the foregoing allegations in paragraphs 1-127 as though set forth herein.

129.   Pursuant to Section 29(b) of the Exchange Act, at 15 U.S.C. § 78cc(b), every contract made in violation, or whose performance or continuance would involve a violation, of the Exchange Act shall be void.  Specifically, Section 29(b) provides in pertinent part that:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract … heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract …

130.   Pursuant to Section 15(a)(1) of the Exchange Act, at 15 U.S.C. § 78o(a)(1), it shall be unlawful for a broker to induce or attempt to induce the purchase or sale of a security unless the broker is registered as a broker with the Securities Exchange Commission ("SEC").  Specifically, Section 15(a)(1) provides that:

US.123761058.02

It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

131.    Pursuant to Section 3(a)(4) of the Exchange Act, a "broker" is "any person engaged in the business of effecting transactions in securities for the account of others."   15 U.S.C. § 78c(a)(4)(A).

132.    At all relevant times, Defendant T&C was engaged in the business of effecting transactions in securities for the account of others.

133.    In connection with the raising of equity financing for Tillerman Seeds from third party investors in connection with the DFS and LSI Acquisitions, Defendant T&C effected transactions in, and induced or attempted to induce the purchase or sale of the Class A membership interests and units in Tillerman Seeds.

134.    The Tillerman Seeds Class A membership interests and units are, and were at all relevant times, securities as defined in Section 2(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(1), and for which T&C filed multiple Form D filings confirming as much.

135.    Accordingly, at all relevant times, Defendant T&C was and acted as a broker with respect to both the First and Second Class A Share Offerings of Tillerman Seeds.

136.    In effecting transactions in, and in inducing or attempting to induce the purchase or sale of the Class A Shares of Tillerman Seeds, Defendant T&C, made use of the mails and other means or instrumentality of interstate commerce.

137.    At all relevant times, Defendant T&C was not registered as a broker with the SEC.

US.123761058.02

138.    As an unregistered broker, Defendant T&C made the Engagement Agreement with Tillerman Seeds in violation of the Exchange Act.

139.    As an unregistered broker, Defendant T&C's performance of its obligations with respect to the DFS and LSI Acquisitions and effecting transactions in, and in inducing or attempting to induce the purchase or sale, of the Class A Shares of Tillerman Seeds involved a violation of the Exchange Act.

140.    As an unregistered broker, Defendant T&C's continuance of its relationship or practices pursuant to the Engagement Agreement is in violation of the Exchange Act.

141.    Tillerman Seeds is in contractual privity with Defendant T&C pursuant to the T&C Engagement Agreement.

142.    Tillerman Seeds is in the class of persons Exchange Act Sections 29(b) and 15(a)(1) were designed to protect.

143.    Tillerman Seeds requests that:  (A) judgment be entered in its favor and against Defendant T&C pursuant to Exchange Act Section 29(b); (B) the Engagement Agreement be voided; (C) all fees and expenses paid by any of the Plaintiffs to T&C pursuant to the Engagement Agreement be rescinded and returned to Plaintiffs, including monthly retainer fees, all success fees paid with respect to transactions, and the 5% carried economic interest in Tillerman Seeds, including all Class A and B shares granted to T&C pursuant to the Engagement Agreement; and (D) such further relief as the Court deems just and proper.

US.123761058.02

## COUNT II:
## VOIDING OF ENGAGEMENT AGREEMENT
## PURSUANT TO 15 U.S.C. § 29(b) AND 15 U.S.C. § 78o(a)(1)
## (AGAINST LENIO AND BLANCHARD)

144.    Plaintiffs restate and reallege the foregoing allegations in paragraphs 1-127 as though set forth herein.

145.    Pursuant to Section 29(b) of the Exchange Act, at 15 U.S.C. § 78cc(b), every contract made in violation, or whose performance or continuance would involve a violation, of the Exchange Act shall be void.  Specifically, Section 29(b) provides in pertinent part that:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract … heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation …

146.    Pursuant to Section 15(a)(1) of the Exchange Act, at 15 U.S.C. § 78o(a)(1), it shall be unlawful for a broker to induce or attempt to induce the purchase or sale of a security unless the broker is registered as a broker with the Securities Exchange Commission ("SEC").  Specifically, Section 15(a)(1) provides that:

> It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

US.123761058.02

147.    Pursuant to Section 3(a)(4) of the Exchange Act, a "broker" is "any person engaged in the business of effecting transactions in securities for the account of others."   15 U.S.C. § 78c(a)(4)(A).

148.    At all relevant times, Defendant Lenio was engaged in the business of effecting transactions in securities for the account of others.

149.    At all relevant times, Defendant Blanchard was engaged in the business of effecting securities for the account of others.

150.    In connection with the raising of debt and equity financing for the account of Tillerman Seeds from third party investors in connection with the DFS and LSI Acquisitions, Defendants Lenio and Blanchard effected transactions in, and induced or attempted to induce the purchase or sale of the membership interests and units in Tillerman Seeds.

151.    The Tillerman Seeds Class A membership interests and units are and were at all relevant times, securities as defined in Section 2(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(1), and for which T&C multiple Form D filings confirming as much.

152.    Accordingly, at all relevant times, Defendant Lenio was and acted as a broker with respect to both the First and Second Class A Share Offerings of Tillerman Seeds.

153.    Accordingly, at all relevant times, Defendant Blanchard was and acted as a broker with respect to both the First and Second Class A Share Offerings of Tillerman Seeds.

154.    In effecting transactions in, and in inducing or attempting to induce the purchase or sale of the Class A Shares of Tillerman Seeds, Defendants Lenio and Blanchard made use of the mails and other means or instrumentality of interstate commerce.

155.    At all relevant times, Defendant Lenio was not registered as a broker with the SEC.

156. At all relevant times, Defendant Blanchard was not registered as a broker with the SEC.

157. As an unregistered broker, Defendant T&C made the Engagement Agreement with Tillerman Seeds in violation of the Exchange Act.

158. As unregistered brokers and principals of Defendant T&C, Defendants Lenio and Blanchard made the Engagement Agreement with Tillerman Seeds in violation of the Exchange Act.

159. As unregistered brokers and principals of Defendant T&C, Defendants Lenio and Blanchard made the Engagement Agreement by causing Defendant T&C to make the Engagement Agreement with Tillerman Seeds, LLC in violation of the Exchange Act.

160. As an unregistered broker, Defendant Lenio also made the Engagement Agreement with Tillerman Seeds in violation of the Exchange Act, by executing the Engagement Agreement on behalf of Defendant T&C as its Managing Director.

161. Accordingly, at all relevant times, neither Defendant Lenio nor Defendant Blanchard are or were strangers to the Engagement Agreement with Plaintiff.

162. In addition, Defendants Lenio or Blanchard are also persons who have acquired rights under the Engagement Agreement with actual knowledge of the facts by which the making or performance of the Engagement Agreement was in violation of the Exchange Act.

163. This includes because as principals and members of Defendant T&C: (1) T&C was simply the vehicle through which Defendants Lenio and Blanchard acted as brokers and were to perform the services for and be paid by Tillerman Seeds, LLC pursuant to the Engagement Agreement; (2) they were the actual beneficiaries of all rights obtained by Defendant Tillerman & Co, LLC pursuant to the Engagement Agreement, which flowed to them through T&C as members

34

of that entity; (3) the services to be provided to Plaintiffs pursuant to the Engagement Agreement were intended to be performed by, and could not be performed except by, Defendants Lenio and Blanchard; and/or (4) Defendants Lenio and Blanchard were granted in their individual capacity the 5% carried economic interest in Tillerman Seeds LLC that was to be paid as a fee to T&C pursuant to the Engagement Agreement.

164.    As unregistered brokers, Defendants Lenio's and Blanchard's performance of Defendant T&C's obligations with respect to the LSI Acquisition and the DFS Acquisition, their effecting transactions in, and their inducing or attempting to induce the purchase or sale of the Class A Shares involved a violation of the Exchange Act.

165.    As unregistered brokers, Defendants Lenio and Blanchard's continuance of their relationship or practices pursuant to the Engagement Agreement is in violation of the Exchange Act.

166.    Tillerman Seeds is in contractual privity with Defendant T&C, and based on the foregoing with Defendants Lenio and Blanchard.

167.    Tillerman Seeds is in the class of persons Exchange Act Sections 29(b) and 15(a)(1) were designed to protect.

168.    Plaintiffs request that:  (A) judgment be entered in their favor and against Defendants Lenio and Blanchard pursuant to Exchange Act Section 29(b); (B) the Engagement Agreement be voided; (C) all fees and expenses paid by Plaintiffs to Defendants Lenio and Blanchard pursuant to the Engagement Agreement be rescinded and returned to Plaintiffs, including monthly retainer payments, all success fees paid with respect to transactions, and a 5% carried economic interest in Plaintiff paid to Defendants

US.123761058.02

Lenio and Blanchard pursuant to the Engagement Agreement; and (D) such further relief as the Court deems just and proper.

**COUNT III**
**VOIDING OF T&C ENGAGEMENT AGREEMENT FOR FRAUD**
**IN THE OFFER AND SALES OF TILLERMAN SEEDS SECURITIES**
**PURSUANT 15 U.S.C. § 29(b) AND 15 U.S.C. § 78o(c)(1)(A)**
**(AGAINST ALL DEFENDANTS)**

169.    Plaintiffs restate and reallege the foregoing allegations in paragraphs 1-127 as though set forth herein.

170.    Pursuant to Section 29(b) of the Securities Exchange Act of 1934 ("Exchange Act"), at 15 U.S.C. § 78cc(b), every contract made in violation, or whose performance or continuance would involve a violation, of the Exchange Act shall be void.  Specifically, Section 29(b) provides in pertinent part that:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract … heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation …

171.    Section 15(c)(1)(A) of the Exchange Act, at 15 U.S.C. § 78o(c)(1)(A) provides in pertinent part that:

> No broker … shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security … by means of any manipulative, deceptive, or other fraudulent device or contrivance.

36

172.     For purposes of Exchange Act Section 15(c)(1), a manipulative, deceptive, or other fraudulent device of contrivance includes, "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.15c1-2(a).

173.     For purposes of Exchange Act Section 15(c)(1), a manipulative, deceptive, or other fraudulent device of contrivance also includes:

> [a]ny untrue statement of a material fact and any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, which statement or omission is made with knowledge or reasonable grounds to believe that it is untrue or misleading.

17  C.F.R. § 240.15c1-2(b).

174.     Pursuant to Section 3(a)(4) of the Exchange Act, a "broker" is "any person engaged in the business of effecting transactions in securities for the account of others."  15 U.S.C. § 78c(a)(4)(A).

175.     The Tillerman Seeds Class A membership interests and units are, and were at all relevant times, securities as defined in Section 2(a)(1) of the Securities Act of 1933, 17 U.S.C. § 77b(a)(1), and for which T&C filed multiple Form D confirming as much.

176.     At all relevant times, Defendant T&C was engaged in the business of effecting transactions in securities for the account of others.

177.     At all relevant times, Defendant Lenio was engaged in the business of effecting transactions in securities for the account of others.

178.     At all relevant times, Defendant Blanchard was engaged in the business of effecting securities for the account of others.

179.     Defendants T&C, Lenio and Blanchard, as agents, CFO and directors for Tillerman Seeds, as well as in their capacities as brokers, they are fiduciaries and had independent duties to

37

disclose all material information in connection with conducting a securities offering, including the Second Class A Share Offering for Tillerman Seeds.

180.    In connection with the Second Class A Share Offering between July and August 2018, the Brokers solicited, offered and sold Class A Shares to investors using false and misleading statements and omitted to disclose information in circumstances in which they had a duty to speak regarding the finances, liabilities, prospects, risks and value of investment in the Class A Shares. Defendants did so by first preparing and causing to be prepared the PPM for the Second Class A Share Offering, which in conjunction with the statements made by the Brokers in conducting the offering, misstated and omitted to state all material facts regarding the purchase price for acquiring LSI and accompanying liabilities to be assumed by Tillerman Seeds and Legacy Seeds, LLC post-acquisition.

181.    In conducting the Second Class A Share Offering, Defendants made and continued to make repeated untrue misstatements of material fact and omissions of material fact to prospective investors with knowledge or reasonable grounds to believe that their statements were untrue or misleading.

182.    In effecting transactions in, and in inducing or attempting to induce the purchase or sale of the Tillerman Seeds Class A shares and units, the Brokers made use of the mails and other means or instrumentality of interstate commerce.

183.    In conducting the Second Class A Share Offering in the fraudulent manner described herein, Defendants' performance under the T&C Engagement Agreement involved a violation of Section 15(c)(1)(A) of the Exchange Act and therefore Plaintiffs are entitled to void that agreement and rescission of all amounts paid thereunder.

US.123761058.02

184.     Tillerman Seeds is in contractual privity with Defendant T&C pursuant to the T&C Engagement Agreement.

185.     Defendants Lenio and Blanchard made the Engagement Agreement by causing Defendant T&C to make the Engagement Agreement with Tillerman Seeds in violation of the Exchange Act.

186.     Defendant Lenio also made the Engagement Agreement with Tillerman Seeds in violation of the Exchange Act, by executing the Engagement Agreement on behalf of Defendant T&C as its Managing Director.

187.     Accordingly, at all relevant times, neither Defendant Lenio nor Defendant Blanchard are or were strangers to the Engagement Agreement with Tillerman Seeds.

188.     In addition, Defendants Lenio or Blanchard are also persons who have acquired rights under the Engagement Agreement with actual knowledge of the facts by which the making or performance of the Engagement Agreement was in violation of the Exchange Act.

189.     This includes because as principals and members of Defendant T&C:  (1) T&C was simply the vehicle through which Defendants Lenio and Blanchard acted as brokers and were to perform the services for and be paid by Tillerman Seeds pursuant to the Engagement Agreement; (2) they were the actual beneficiaries of all rights obtained by Defendant T&C pursuant to the Engagement Agreement, which flowed to them through T&C as members of that entity; (3) the services to be provided to Plaintiffs pursuant to the Engagement Agreement were intended to be performed by, and could not be performed except by, Defendants Lenio and Blanchard; and/or (4) Defendants Lenio and Blanchard were granted in their individual capacity the 5% carried economic interest in Tillerman Seeds that was to be paid as a fee to T&C pursuant to the Engagement Agreement.

190.     The Brokers' performance of Defendant T&C's obligations with respect to the DFS and LSI Acquisitions, their effecting transactions in, and their inducing or attempting to induce the purchase or sale of the Tillerman Seeds Class A Shares and units involved a violation of the Exchange Act.

191.     Defendants Lenio's and Blanchard's performance of the Second Class A Share Offering in the manner described herein pursuant to the Engagement Agreement is in violation of the Exchange Act.

192.     Tillerman Seeds is in contractual privity with Defendant T&C, and based on the foregoing with Defendants Lenio and Blanchard.

193.     Tillerman Seeds is in the class of persons Exchange Act Sections 29(b) and 15(a)(1) were designed to protect.

194.     On this additional ground, therefore, Tillerman Seeds requests that:  (A) judgment be entered in its favor and against Defendant T&C pursuant to Exchange Act Section 29(b); (B) the Engagement Agreement be voided; (C) all fees and expenses paid by any of the Plaintiffs to T&C pursuant to the Engagement Agreement be rescinded and returned to Plaintiffs, including monthly retainer fees, all success fees paid with respect to transactions, and the 5% carried economic interest in Tillerman Seeds, including all Class A and B shares granted to T&C pursuant to the Engagement Agreement; and (D) such further relief as the Court deems just and proper.

### COUNT IV:
### DECLARATORY JUDGMENT
### (AGAINST T&C)

195.     Plaintiffs restate and reallege the foregoing allegations in paragraphs 1-127 as though set forth herein.

US.123761058.02

196.    An actual case and controversy exists between Tillerman Seeds, LLC and T&C regarding the validity and enforceability of the Engagement Agreement. Plaintiffs are entitled to seek a declaration under 28 U.S.C. § 2201.

197.    Section 15(a) of the Securities Exchange Act makes it "unlawful for any broker...to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security ...) unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

198.    T&C was not a registered broker dealer as required by Section 15(a) of the Exchange Act.  Lenio and Blanchard were not registered broker dealers.

199.    In connection with its sale of securities on behalf of Tillerman Seeds, T&C acted as an unregistered broker.

200.    Section 29 of the Securities Exchange Act renders "[e]very contract,…the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder…void."

201.    Because T&C acted as an unregistered broker in violation of federal law, Tillerman Seeds, LLC is entitled to a declaration and judgment invalidating the Engagement Agreement.

202.    Plaintiffs request a declaration and judgment invalidating the Engagement Agreement, holding it void and unenforceable against Plaintiffs.

US.123761058.02

## COUNT V:
## BREACH OF FIDUCIARY DUTY
## (ALL DEFENDANTS)

203.    Plaintiffs restate and reallege the foregoing allegations in paragraphs 1-127 as though set forth herein.

204.    As Chief Financial Officer, T&C and its principal, Lenio, who served in that position, were officers of Tillerman Seeds, D.F. Seeds, and Legacy Seeds.

205.    As board members, Lenio and Blanchard were directors of Tillerman Seeds, D.F. Seeds, and Legacy Seeds.

206.    As a broker, the Brokers were agents of Tillerman Seeds with respect to the Acquisitions and the Class A share offerings.

207.    By operation of law, Defendants owed fiduciary duties to Tillerman Seeds, and Legacy Seeds, LLC, and therefore owed Plaintiffs duties of loyalty, good faith, care, skill, diligence, and to provide information that Defendants knew or had reason to know Plaintiffs would wish to have.

208.    Defendants stood to profit from soliciting investments and made sure that there was no barrier to closing the LSI Acquisition.  Having already failed to consummate an acquisition during the first year of negotiations with Legacy Seeds, Inc, Defendants had increased incentive to consummate the LSI Acquisition to ensure their personal gain.

209.    Had Defendants disclosed the net working capital adjustment or their lack of SEC registration, the LSI Acquisition and the DFS Acquisition would not have occurred in the manner Defendants conducted the offering of Class A shares.

US.123761058.02

210.    By failing to adequately disclose material information, Defendants acted in their own self-interest, rather than in the interests of Tillerman Seeds, Legacy Seeds, LLC, and D.F. Seeds, LLC, and thereby breached their duties of loyalty and/or good faith.

211.    In addition, by failing to adequately disclose material information, Defendants breached their duties of care, skill, and/or diligence.

212.    In addition, by failing to adequately disclose material information, Defendants breached their duty to provide information that Defendants knew or had reason to know Plaintiffs would wish to have.

213.    Defendants' conduct breached their fiduciary duties to Tillerman Seeds, LLC; D.F. Seeds, LLC; and Legacy Seeds, LLC.

214.    Plaintiffs have suffered damages as a direct and proximate result of Defendants' breaches of fiduciary duty and as a result Plaintiffs are seeking to recover: (i) the amounts Tillerman Seeds has had to pay and will have to pay to mitigate the damages caused by T&C, Lenio and Blanchard including rescinding investors from the defective Class A offerings, (ii) professional fees related to same, (iii) potential fines and/or civil penalties with regulatory entities, (iv) increased borrowing costs imposed by lenders, (v) any amounts paid in fees and shares to T&C, Lenio and Blanchard than it otherwise should have for the services they rendered; and (vi) any other relief the Court deems just and proper.

215.    Plaintiffs request that judgment be entered in their favor and against Defendants in an amount to be proven at trial, sufficient to reasonably compensate Plaintiffs for the damages incurred as a result of Defendants' breach of duty of loyalty.

US.123761058.02

## COUNT VI:
## FRAUDULENT MISREPRESENTATION
## (ALL DEFENDANTS)

216.    Plaintiffs restate and reallege the foregoing allegations in paragraphs 1-127 as though set forth herein.

217.    Defendants made several representations regarding their expertise and qualifications to serve as securities brokers on behalf of Plaintiffs.

218.    In their discussions, negotiations, and communications with Plaintiffs, Defendants misrepresented or omitted several material facts related to their expertise and qualifications. The following omissions were fraudulent and material:

a.    Defendants failed to disclose that they did not hold the registrations, licensures, certifications, and other qualifications necessary to perform the duties for which Tillerman Seeds hired them;

b.    Defendants omitted that they were not registered brokers.

219.    In addition, Defendants also misrepresented or failed to disclose to Legacy Seeds with respect to the LSI Acquisition that:

a.    They were withholding material information from potential investors and creditors;

b.    They did not, or could not, calculate the actual amount of the net working capital adjustment such that legitimate valuation of the LSI Acquisition was impracticable; and

c.    Tillerman Seeds, was undercapitalized and that Tillerman Seeds would not be able to pay the net working capital adjustment when due.

220.    These misrepresentations were false when made.

US.123761058.02

221.    Registration as a broker is material because of strict regulatory enforcement by the federal government and, in particular, the Securities and Exchange Commission. Strict compliance with securities laws is necessary to avoid significant liability.

222.    Proper disclosures to potential investors and banks are material because improper, incomplete, or incorrect disclosures can expose an issuer to potential liability.

223.    Defendants were under an obligation, as a fiduciary and as the party with unique knowledge of the omitted information, to disclose the omitted information described above to Tillerman Seeds. Defendants had an affirmative legal obligation to disclose material information.

224.    At the time of the misrepresentations, Defendants knew they were false or made the representations recklessly, without any knowledge of their truth and as a positive assertion.

225.    Defendants also made these misrepresentations with the intention that Plaintiffs would act upon it and Plaintiffs reasonably relied upon the misrepresentations based on Defendants qualifications and expertise.

226.    Plaintiffs also reasonably relied to their detriment on Defendants' silence as to the omitted information.

227.    Had Plaintiffs known the falsity of Defendants' representations or the omission of material information, Plaintiffs would have either (1) retained different individuals or entities to serve as their broker; (2) attempted to confirm the accuracy of Defendants' representations to potential investors and banks; or (3) made different

US.123761058.02

disclosures to potential investors and banks by disclosing accurate information as to the financial health of Tillerman Seeds.

228.   Reasonably relying on Defendants' misrepresentations and material omissions, Plaintiffs were induced to retain Defendants' services as brokers.

229.   Plaintiffs have suffered damages as a direct and proximate result of retaining Defendants, and as a result Plaintiffs are seeking to recover: (i) the amounts Tillerman Seeds has had to pay and will have to pay to mitigate the damages caused by T&C, Lenio and Blanchard including rescinding investors from the defective Class A offerings, (ii) professional fees related to same, (iii) potential fines and/or civil penalties with regulatory entities, (iv) increased borrowing costs imposed by lenders, (v) any amounts paid in fees and shares to T&C, Lenio and Blanchard than it otherwise should have for the services they rendered; and (vi) any other relief the Court deems just and proper.

230.   Plaintiffs request that judgment be entered in their favor and against Defendants in an amount to be proven at trial, sufficient to reasonably compensate Plaintiffs for the damages incurred as a result of Defendants' misrepresentations.

**COUNT VII:**
**NEGLIGENCE**
**(ALL DEFENDANTS)**

231.   Plaintiffs restate and reallege the foregoing allegations in paragraphs 1-127 as though set forth herein.

232.   Defendants owed Plaintiffs a duty to carry out their obligations as reasonably prudent Broker in connection with the LSI Acquisition and related capital raising and debt

financing. That duty included the obligation to fully and accurately disclose details as to the particulars of the LSI Acquisition to potential investors and banks.

233.   Defendants breached their duty by withholding or misrepresenting material information, including the amount of the net working capital adjustment to potential investors and banks.

234.   As a result of Defendants' breach, it has caused Plaintiffs and Plaintiffs are seeking to recover: (i) the amounts Tillerman Seeds has had to pay and will have to pay to mitigate the damages caused by T&C, Lenio and Blanchard including rescinding investors from the defective Class A offerings, (ii) professional fees related to same, (iii) potential fines and/or civil penalties with regulatory entities, (iv) increased borrowing costs imposed by lenders, (v) any amounts paid in fees and shares to T&C, Lenio and Blanchard than it otherwise should have for the services they rendered; and (vi) any other relief the Court deems just and proper.

235.   Plaintiffs' damages are a direct and proximate result of Defendants' breaches of duty.

236.   Plaintiffs request that judgment be entered in their favor and against Defendants in an amount to be proven at trial, sufficient to reasonably compensate Plaintiffs for the damages incurred as a result of Defendants' negligence.

US.123761058.02

## COUNT VIII:
## NEGLIGENT MISREPRESENTATION AND OMISSION
## (ALL DEFENDANTS)

237.   Plaintiffs restate and reallege the foregoing allegations in paragraphs 1-127 as though set forth herein.

238.   Defendants made several representations regarding their expertise and qualifications to serve as securities brokers on behalf of Plaintiffs.

239.   In their discussions, negotiations, and communications with Plaintiffs, Defendants negligently misrepresented or omitted several material facts related to their expertise and qualifications. The following omissions were negligent and material:

    a.    Defendants failed to disclose that they did not hold the registrations, licensures, certifications, and other qualifications necessary to perform the duties for which Tillerman Seeds hired them;

    b.    Defendants omitted that they were not registered brokers.

240.   In addition, Defendants also misrepresented or failed to disclose to Legacy Seeds with respect to the LSI Acquisition that:

    a.    They were withholding material information from potential investors and creditors;

    b.    They did not, or could not, calculate the actual amount of the net working capital adjustment such that legitimate valuation of the LSI Acquisition was impracticable; and

    c.    Tillerman Seeds, was undercapitalized and that Tillerman Seeds would not be able to pay the net working capital adjustment when due.

241.   These misrepresentations were false when made.

US.123761058.02

242.    Registration as a broker is material because of strict regulatory enforcement by the federal government and, in particular, the SEC. Strict compliance with securities laws is necessary to avoid significant liability.

243.    Proper disclosures to potential investors and banks are material because improper, incomplete, or incorrect disclosures can expose an issuer to potential liability.

244.    Defendants were under an obligation, as a fiduciary and as the party with unique knowledge of the omitted information, to act with care and disclose the omitted information described above to Tillerman Seeds.

245.    Defendants had an affirmative legal obligation to disclose material information.

246.    The omission by Defendants was negligent.

247.    Plaintiffs reasonably relied to their detriment on the information Defendants' provided without reasonable care related to their qualifications and expertise.

248.    Plaintiffs also reasonably relied to their detriment on Defendants' silence as to the omitted information that was provided without reasonable care.

249.    Had Plaintiffs known the falsity of Defendants' representations or the omission of material information, Plaintiffs would have either (1) retained different individuals or entities to serve as Broker; (2) attempted to confirm the accuracy of Defendants' representations to potential investors and banks; or (3) made different disclosures to potential investors and banks by disclosing accurate information as to the financial health of Tillerman Seeds.

US.123761058.02

250.     Reasonably relying on Defendants' affirmative representations and Defendants' material omissions, Plaintiffs were induced to retain Defendants' services as brokers.

251.     Plaintiffs have suffered damages as a direct and proximate result of retaining Defendants, and as a result Plaintiffs are seeking to recover: (i) the amounts Tillerman Seeds has had to pay and will have to pay to mitigate the damages caused by T&C, Lenio and Blanchard including rescinding investors from the defective Class A offerings, (ii) professional fees related to same, (iii) potential fines and/or civil penalties with regulatory entities, (iv) increased borrowing costs imposed by lenders, (v) any amounts paid in fees and shares to T&C, Lenio and Blanchard than it otherwise should have for the services they rendered; and (vi) any other relief the Court deems just and proper.

252.     Plaintiffs request that judgment be entered in their favor and against Defendants in an amount to be proven at trial, sufficient to reasonably compensate Plaintiffs for the damages incurred as a result of Defendants' misrepresentations.

50

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment against Defendants and ask that this

Court, in addition to the relief granted in Counts I through VIII above, also award:

i)      Award Plaintiffs the costs of this action, including reasonable attorneys'

        fees; and

ii)     Award Plaintiffs such other and further relief as the Court may deem just

        and equitable.

Dated  July 2, 2019                     Respectfully submitted,


                                        FAEGRE BAKER DANIELS LLP


                                        By:    /s/ Kerry l. Bundy
                                        Kerry L. Bundy, Esq.
                                        Faegre Baker Daniels LLP
                                        2200 Wells Fargo Center
                                        90 South Seventh Street
                                        Minneapolis, MN  55402-3901
                                        Tel:       (612) 766-7000
                                        Fax:       (612) 766-1600
                                        Email:     Kerry.bundy@FaegreBD.com

                                        *Attorney for Plaintiffs, Tillerman Seeds, LLC (n/k/a
                                        Legacy Seed Companies, LLC),
                                        Legacy Seeds, LLC, and D.F. Seeds, LLC*

US.123761058.02